

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| DIRK RALPH GORHAM, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| v. | § | 2:06-CV-0075 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

### SUPPLEMENT TO DECEMBER 5, 2008 REPORT AND RECOMMENDATION TO DENY PETITION FOR A WRIT OF HABEAS CORPUS

On December 5, 2008, this Court issued its Report and Recommendation to Deny Petition for a Writ of Habeas Corpus by a Person in State Custody. On December 18, 2008, petitioner filed objections to the Report and Recommendation. In his objections, petitioner Gorham reurges his claim of actual innocence and makes other objections. Because of petitioner's actual innocence claim and in light of the victim's recantation of her original sexual assault outcry, the undersigned has again reviewed the record, including all of the trial proceedings, the documents filed by petitioner including his objections, and the pertinent case law. This supplement will address petitioner's actual innocence claim and will clarify the dates regarding one of petitioner's ineffective assistance of counsel claims. Because this Court concludes, as it did in its December 5, 2008 Report and Recommendation, that petitioner has failed to present any meritorious claim for relief, the undersigned finds there exists no basis to

change the previous recommendation that petitioner's federal application for habeas corpus relief be DENIED.

I.
FACTUAL AND PROCEDURAL HISTORY

The child victim in this case, L.G., originally reported to a school friend that she had been sexually assaulted by her step-father, the petitioner. She repeated her claims to a nurse, the school friend's mother, her own mother, and two CPS workers. (R.R. vol. 3, pgs. 144, 206; R.R. vol. 4, pg. 14, 95, 146). Physical evidence presented by the testimony of Nurse Michele Gorday, who examined L.G. four days after the assault, supported L.G.'s report of an assault. The nurse testified L.G. had a torn hymen and such an injury is not possible without penetration of the female sexual organ. The nurse stated she could not say, just from the medical exam, exactly how the hymen was damaged, but she could say that something had penetrated L.G.'s sexual organ. (R.R. vol. 3, pg. 151-52).

As petitioner argues, the nurse offered only a hand-drawn diagram at trial to support her conclusions and did not have any pictures of the torn hymen. Petitioner also points out L.G. had told a police officer and a CPS worker petitioner had *not* sexually assaulted her, but that she had made up the story as part of a truth or dare game. (R.R. vol. 4, pg. 168-169). It is noted, however, that she later told the nurse (Gorday) she had lied to the CPS worker because she felt uncomfortable. (R.R. vol. 3, pg. 144). L.G.'s trial testimony was consistent with what she told the police officer and CPS worker, i.e., that no assault occurred. (R.R. vol. 4, pg. 111).

In considering a claim of actual innocence, the evidence must be considered in light of the entire trial. In petitioner's case, the evidence at trial was that L.G. told a nurse she had spoken with her mother about the sexual abuse, which was not a one-time incident, but rather

part of a history of sexual abuse. (R.R. vol. 3, pg. 144). L.G.'s mother "said that she was going to take care of it and to not talk to anybody about it." (*Id.*). L.G. told the nurse her mother wanted to wait to take action until petitioner's mother, who was visiting the family, left because she did not want to hurt his mother. (*Id.*). The mother also told L.G., "we would have to stay there for a little while because we didn't have the money to do anything different. And she told me to sleep with my grandmother." (*Id.*). L.G. confided to the nurse:

> My mom is going to be mad at me because she told me to promise not to say anything to anybody. She doesn't want him to go to jail or anything like that. She told me she was going to fix it. She's going to be really mad and hurt someone if he goes to jail.

(*Id.* at pg. 145). A CPS worker testified that L.G. had told her and a fellow CPS worker, "she did not want to see her mother. Her mother would be angry with her because her mother had told her not to tell anyone of the abuse." (R.R. vol. 4, pg. 94). At trial, the State played a tape recording of a conversation the mother had with petitioner while petitioner was in jail awaiting trial, which corroborated what L.G. had told the nurse and CPS workers. In the recording, the mother said:

> Well, you know, their [sic] telling me I need to love on [L.G.] and -- and all this other stuff. But I'm sorry . . . Because if something like this happened -- I thought -- *when she told me*, I thought I was the first person she said something to. And she went and said something to them people and didn't even tell me. After she told me, she still didn't tell me she told them.

(R.R. vol. 4, pg. 16) (emphasis added). The victim's mother, in fact, candidly admitted that L.G. had told her about petitioner sexually abusing her several days before CPS took L.G. away from the home. (*Id.* at pg. 14).

The State also introduced several other conversations between petitioner and L.G.'s mother (petitioner's wife) that occurred while petitioner was incarcerated and awaiting trial.

Considering these conversations and the evidence at trial, these conversations can be characterized as showing petitioner and his wife were attempting to persuade L.G. how to testify at trial.[1]

The central issue for the jury was whether L.G. was telling the truth when she reported that the defendant had committed the offense of aggravated sexual assault by placing her hand on his sexual organ and by penetrating her sexual organ with his finger, or whether, the victim, L.G., was not telling the truth about the petitioner committing these acts and, instead, was telling the truth when she recanted her accusations and stated both prior to trial and at trial that she had made the allegations up, that they were false, and that the petitioner had never inappropriately touched her.

The evidence showing petitioner did sexually assault L.G. included:

- A nurse, who spoke with L.G. four days after the abuse and performed an exam indicating a sexual assault had occurred.

- L.G.'s friend, who L.G. originally talked to about the sexual abuse.

- A friend's mother, who was the first adult L.G. told about the abuse.

- A CPS worker, who said L.G. was crying in the car with her and another CPS worker because her mother had made her promise to not tell anyone about the sexual assault.

The evidence showing petitioner did not sexually assault L.G. included:

---

[1] The date the conversations occurred and their location in the record are as follows:
    December 7, 2002 at R.R. vol. 4, pg. 25-27.
    December 8, 2002 at R.R. vol. 4, pg. 27.
    December 10, 2002 at R.R. vol. 4, pg. 32-33.
    December 11, 2002 at R.R. vol. 4, pg. 34-35.
    February 7, 2003 at R.R. vol. 4, pg. 36.
    February 8, 2003 at R.R. vol. 4, pg. 37.
    February 9, 2003 at R.R. vol. 4, pg. 38.

- A doctor, who testified to the various ways other than sexual assault that could have caused the damage to L.G.'s hymen.

- A CPS worker, who videotaped L.G. stating she had invented the story as part of a truth or dare game.

- Petitioner's mother, who said she was with L.G. that morning and nothing happened.

- L.G. herself, who said she invented the story as part of a truth or dare game.

At the conclusion of the trial, the jury found petitioner guilty. The trial court entered judgment consistent with the jury's verdict and sentenced petitioner to a term of forty years' imprisonment in the Texas Department of Criminal Justice, Correction Institutions Division. The conviction and sentence were affirmed on direct appeal and petition for discretionary review was denied by the Texas Court of Criminal Appeals. Petitioner's state petition for a writ of habeas corpus was denied without written order. This Court recommended petitioner's federal petition for habeas relief be denied. Petitioner filed several objections to the Court's recommendation, including an objection reurging his claim of actual innocence. This supplement to the Report and Recommendation is now made.

## II.
## THE LAW REGARDING ACTUAL INNOCENCE CLAIMS IN HABEAS PLEADINGS

As discussed in this Court's December 5, 2008 Report and Recommendation, a free-standing actual innocence claim is not cognizable on federal habeas review. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993). To be clear, a federal habeas court *does not* concern itself with petitioner's guilt or innocence—that is an issue of fact for determination by the state courts, not the federal courts on habeas review. *Id.* The *sole* question a federal court considers on habeas review is whether the petitioner's federal

constitutional rights were violated. *Id.*

Petitioner presented his claims to this Court contending there are two categories of actual innocence claims—*Herrera*-type claims and *Schlup*-type claims. In the first of these (*Herrera*), a petitioner claims newly discovered evidence supports his claim of actual innocence and, even if the state proceedings were entirely fair and error free, argues the punishment of a potentially innocent person is a constitutional violation the federal habeas court should not permit. *See Herrera v. Collins*. 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203. A *Herrera*-type claim is not cognizable on federal habeas review. In *Herrera*, the Supreme Court held "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404, 113 S. Ct. at 862. A petitioner cannot successfully assert a free-standing actual innocence claim in a habeas petition. *See id.*; (Petitioner's *Memorandum in Support of Application for a Writ of Habeas Corpus*, pg. 1 (hereinafter "*Pet. Memo.*")).

Petitioner's memorandum also mentions the *Schlup*-type of actual innocence claim. *See Schlup v. Delo*, 513 U.S. 298, 314, 115 S. Ct. 851, 860, 130 L. Ed. 2d 808 (1995). In *Schlup*, the Court determined the standard a petitioner must meet to establish actual innocence. If he meets that standard, the court can consider other procedurally barred claims, but does not grant relief upon actual innocence. In *Schlup*, the petitioner, who was convicted of capital murder and sentenced to death, contended he received ineffective assistance of counsel and that the prosecution withheld exculpatory evidence, both of which resulted in the jury's incorrect guilty verdict. *Id.* Schlup's claims, i.e. of ineffective assistance of counsel and of a *Brady* violation, were procedurally barred. The *Schlup* Court held the assertion of actual innocence was a

gateway to bring forth defaulted claims for review. *Id*. at 327, 115 S. Ct. at 851; *House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 2077, 165 L. Ed. 2d 1 (2006). The Supreme Court later explained:

> In the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims. Yet a petition supported by a convincing *Schlup* gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error"; hence, "a review of the merits of the constitutional claims" is justified.

*House*, 547 U.S. at 537, 126 S. Ct. at 2077 (quoting *Schlup*, 513 U.S. at 317, 115 S. Ct. at 851).

Petitioner Gorham is not entitled to bring his actual innocence claim to this Court under *Schlup* because he has not identified any procedurally barred claims he is attempting to have the Court consider. *Schlup* does not establish an exception allowing "actual innocence" claims to be heard on the merits. Instead, those innocence claims are only heard to determine if the petitioner's otherwise procedurally barred claims should be considered.

III.
PETITIONER'S ACTUAL INNOCENCE CLAIM

If this Court cannot consider the merits of the new evidence petitioner offers, it certainly cannot conduct evidentiary hearings on it.[2] As previously stated, petitioner does not present any procedurally defaulted claims. (In fact, the memorandum supporting petitioner's habeas application appears to be an exact copy of the memorandum supporting his state habeas application). Here, the sum total of petitioner's argument for actual innocence is, based upon some letters from two doctors, that this Court should review the jury's determination of guilt and

---

[2] Petitioner additionally relies on *Ex Parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), for the proposition that the proper standard of review is whether the new evidence unquestionably shows the petitioner's innocence. (*Pet. Memo.* at 1). Not only has this case been superceded by statute in Texas law, but the decisions of a state court have no precedential value in federal court. The law governing this Court establishes that a free-standing actual innocence claim must fail on federal habeas review.

all of the other state court determinations refusing to contradict the jury's determination, and overturn the jury's verdict. That is not the purpose of federal habeas review. *See Herrera*, 506 U.S. at 400, 113 S. Ct. at 860.

## IV.
## THE "EVIDENCE" OF ACTUAL INNOCENCE

Even if petitioner's actual innocence claim were cognizable, he is not entitled to relief. For the sake of argument the Court will address petitioner's claim of innocence and his continued focus on the documents and photos he offers to this Court for review in connection with such claim.

Petitioner heavily relies on three letters from two different doctors (dated February 23, 2005, September 15, 2005, and October 5, 2005). According to petitioner, each of the doctors examined L.G. and determined she had not suffered any sexual assault. Petitioner overstates the strength of these letters in proving his innocence. The Court notes the February 23, 2005 letter concerns an examination of L.*M.*— a girl with the same first name but a different last name than the victim in this case. Even though there are no other documents referring to L.G. by a different last name, the testimony at trial indicates L.G.'s mother may have had a last name beginning with "M" prior to her marriage to petitioner. Therefore, the Court assumes L.M. is in fact the victim.

The letters from the doctors do not establish petitioner is actually innocent.[3] Certainly, the subsequent medical examinations of the minor, L.G., are in no way relevant on the issue of whether petitioner placed L.G.'s hand on his sexual organ. Instead, it appears this evidence is proffered for the purpose of showing one of two things. It has been proffered to show the

---

[3] Further, the letters from the doctors are not sworn. On their face, they have no indication of authenticity.

testimony of Michele Gorday that her examination of L.G. in December 2002 reflecting that L.G. suffered two transactions or tears to her hymen was incorrect and/or false. Alternatively, it has been proffered to establish that petitioner did not insert his fingers into L.G.'s sexual organ. Dr. Archer's findings establish neither of those things. Instead, Dr. Archer's statement confirms that a sexual assault exam is incapable of ultimately determining a sexual assault actually took place in an instance where the victim denies the assault occurred. Dr. Archer specifically states ". . . it is really not possible to determine if a girl or woman has ever been sexually active based upon the appearance of the hymen." Dr. Archer states, "[t]he only way to determine if a woman has been sexually active is to ask her." Dr. Archer, however, bases her conclusions upon her understanding of the facts as related to her by petitioner's wife. Dr. Archer was not provided all the relevant facts, particularly on two key points.

1. Dr. Archer says L.M.'s mother told her that at the time of the exam by the nurse her daughter denied being sexually active or sexually assaulted. (*Pet. Memo.* Exhibit A(2), pg. 1). The testimony at trial, however, established L.G., at the time of the examination, in fact was claiming petitioner had sexually assaulted her. (R.R. vol. 3, pg. 144-45). The nurse's testimony was also that L.G.'s hymen was physically damaged, i.e. torn, which could have occurred only by the penetration of her female sexual organ. (R.R. vol. 3, pg. 149-52).

2. Dr. Archer says L.M.'s mother told her the exam was performed two months after the sexual assault. (*Pet. Memo.* Exhibit A(2), pg. 1). The testimony, however, established the exam was performed four days after the assault. (R.R. vol. 3, pg. 145).

Based on these two erroneous assumptions, Dr. Archer stated, "There is *no possible way* that a health care provider, nurse, physician's assistant, or a physician could determine that intercourse had occurred 2 months after the fact based upon the appearance of the hymen. . . . If there had been an assault, the time lag of 2 months would have allowed time for healing." (*Pet. Memo.* Exhibit A(2), pg. 1). Dr. Archer also stated, "An examination alone is *absolutely not*

*sufficient* to determine if a woman, or child in this case, is (or ever was) sexually active. If [L.M.] states that she was not sexually active, it would not be possible for me to determine that she was not telling the truth." (*Id.* at pg. 1-2). Dr. Archer's findings do not establish petitioner's innocence.

The other two letters (dated September 15, 2005 and October 5, 2005) are from a Dr. Lahoti, who additionally not only examined L.G., again apparently at L.G.'s mother's behest, but also took digital pictures of L.G.'s female sexual organ. Petitioner has submitted both letters and has asked this Court to accept and review the photos of L.G.'s female sexual organ, which the Court has declined to do. The Dr. Lahoti letters are substantially shorter and less detailed than Dr. Archer's letter, and say only that L.G.'s "genital examination did not reveal any traumatic injury to her hymen" and that "[h]er anal examination was normal." (*Petitioner's Response to Respondent's Answer* (hereinafter *Pet.'s Response*), Exhibit C, pg. 1).

These letters and photographs based on an examination done almost three years after the sexual assault are of little value, especially in light of the fact that Dr. Lahoti never states anything about L.G.'s sexual history. She only says, at that point in time, i.e. in 2005, L.G.'s hymen was not presently damaged. She does not say anything regarding the state of L.G.'s hymen immediately after the 2002 assault outcry. Importantly, she offers no evidence as to whether L.G.'s hymen was ever, at any point in time, torn. Therefore, even assuming Dr. Lahoti was absolutely correct that L.G.'s hymen was not damaged in 2005 and even if the pictures of L.G.'s sexual organ that petitioner continues to attempt to present to the Court indeed show L.G.'s hymen was without trauma in late 2005, such evidence would have no bearing on the injury described by Nurse Gorday in 2002. If it would have any such implication, Dr. Lahoti did

not so indicate in her letters (and Dr. Archer specifically indicated in her letter that such a determination is physically impossible).

The only evidence regarding L.G.'s hymen at the time of the offense was the report created by the nurse who examined her in 2002, four days after the outcry, and the nurse's hand drawing done at trial. That evidence (the report) indicated L.G. gave explicit and detailed facts of the various ways petitioner had sexually assaulted her and of her mother's unwillingness to take proper action against petitioner. It also revealed that L.G.'s torn hymen provided physical evidence corroborating her allegations. All of this indicates L.G was not lying about the sexual assault and supports the jury verdict.

In conclusion, if petitioner's actual innocence claim was cognizable, the "new evidence," as petitioner has classified it, does not entitle him to federal habeas corpus relief for at least three reasons.

1. The issue is whether the letters by Drs. Archer and Lahoti, if properly before this Court, establish that the testimony by Michele Gorday, the sexual assault nurse who examined L.G. in December 2002, was false and/or incorrect. Neither Dr. Lahoti nor Dr. Archer appear to have been provided with Michele Gorday's testimony prior to making their findings. If they were so provided, there is nothing in any of their letters indicating they reviewed Michele Gorday's testimony and found it in error. Neither Dr. Lahoti nor Dr. Archer, based upon their examinations of the victim, could state no sexual assault occurred, nor could they state that there had never been any transaction or tears to the hymen. The evidence at trial established there were tears to the hymen. The evidence was not that the hymen had been compromised in anyway other than the tears identified

by Michele Gorday. Dr. Archer's letter indicates that an examination, even after a period of two months, would have allowed time for healing. Consequently, petitioner's submission is insufficient to establish actual innocence. Further, to the extent the examinations by Drs. Archer and Lahoti are incomplete or their reports are incomplete, it was petitioner's responsibility to adequately develop the record. Drs. Archer or Lahoti did not provide any information with respect to whether they had an opinion regarding Michele Gorday's trial testimony and whether or not it was medically accurate. A petitioner's failure to develop the record constitutes a basis to deny relief.

2. The letters by Drs. Archer and Lahoti were submitted during state habeas proceedings in connection with an actual innocence claim. In that proceeding, the Texas Court of Criminal Appeals denied relief without written order. Under the AEDPA, that state court decision is entitled to deference by the federal habeas court and relief cannot be granted unless this Court determines, as applicable to this case, that the state court determination of the facts was unreasonable. The state court's decision was not unreasonable.

3. The evidence petitioner offers as "new evidence," i.e., Drs. Archer's and Lahoti's letters, does not qualify as new evidence. This evidence could have been developed at trial. In fact, petitioner called as an expert witness at trial a gynecologist, Dr. Clyde Williams. Petitioner offers no reason he could not have produced expert testimony regarding L.G.'s condition at trial, or at the very least, in a timely motion for new trial. This evidence was not obtained until October 2004, and after almost two years after the incident in question and over eighteen months after the trial.

The Court, considering "all of the evidence, old and new, incriminating and exculpatory," considering the fact that the new evidence is in the form of examinations performed several years after the assault, concludes there is no basis to support petitioner's actual innocence claim even if it were cognizable. *See House*, 547 U.S. at 537-38, 126 S.Ct. at 1077.

IV.
CLARIFICATION AS TO AMENDMENT OF INDICTMENT DISCUSSED
IN DECEMBER 5, 2008 REPORT AND RECOMMENDATION

In its December 5, 2008 Report and Recommendation, the Court said the State moved to amend the indictment against petitioner on February 5, 2003, which was before petitioner's trial started on February 10. (December 5, 2008 Report and Recommendation, pg. 12). Petitioner notes in his objection "this [C]ourt states that the changing of the [i]ndictment happened on Feb. 5th 2003, no it happened on the day of the trial." (*Petitioner's Response to Magistrate's Recommendation*, pg. 7).

To clarify this point, the State did, indeed, move to amend the indictment on February 5, 2003, which was five days before the originally scheduled trial date of February 10, 2003. (C.R. pg. 54-58). The trial court conducted a hearing on, and granted, the State's motion on February 10, 2003. (R.R. vol. 2, pg. 6). As stated in the December 5, 2008 Report and Recommendation, Texas law establishes that "After notice to the defendant, a matter of form or substance in an indictment or information may be amended *at any time* before the date the trial on the merits commences." TEX. CODE CRIM. PROC. ANN. art. 28.10(a) (Vernon 2006) (emphasis added). The only relief from amendments to the indictment is that a petitioner is entitled to a ten-day period to respond to the amendment. *See id.*

Petitioner's trial on the merits was originally scheduled to begin on February 10, 2003. The trial on the merits did not begin on that day, however—only pretrial matters were addressed. The trial on the merits commenced on February 24, 2003, fourteen days after the motion to amend was granted. (R.R. vol. 3). Therefore, petitioner's attorney did not render ineffective assistance by not objecting to the amendment because there was no objection to be had—the action was permitted under Texas law. As noted in the December 5, 2008 Report and Recommendation, even if the trial had started on the very day of the amendment rather than two full weeks later, petitioner would still have no claim on this point because he personally signed a waiver of the ten-day preparation period. (C.R. pg. 90).

V.
RECOMMENDATION

Petitioner has failed to demonstrate the state court proceedings "resulted in a decision that was contrary to . . . clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(defendant). Therefore, there is no contention advanced by petitioner in his December 18, 2008 objections which warrants any change in the Recommendation of the United States Magistrate Judge to the United States District Judge that the Petition for a Writ of Habeas Corpus by a Person in State Custody filed by petitioner DIRK RALPH GORHAM be DENIED.

VI.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 6th day of March 2009.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


* **<u>NOTICE OF RIGHT TO OBJECT</u>** *

The undersigned has addressed, in this supplement, only the issue of why petitioner's "actual innocence" claim is not cognizable, as set out in the December 5, 2008 Report and Recommendation, and has corrected the date of the amendment to the indictment. Additional time for objections is not warranted. However, in an excess of caution, petitioner will be allowed to file objections.

The parties are hereby NOTIFIED that the deadline for filing any objections is eleven (11) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. Plaintiff. 5(b)(2)(B), or transmission by electronic means, Fed. R. Civ. Plaintiff. 5(b)(2)(Defendant). When service is made by mail or electronic means, three (3) days are added after the prescribed period. Fed. R. Civ. Plaintiff. 6(e). Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. Plaintiff. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas. **<u>No extensions of time will be granted.</u>**

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).